Law Offices Of:
HARRISON & MATSUOKA

WILLIAM A. HARRISON   #2948
1001 Bishop Street, Suite 1180
Davies Pacific Center
Honolulu, Hawaii 96813
Telephone Number:  523-7041
Facsimile Number:  538-7579
E-Mail:  wharrison@hamlaw.net

Attorney for Defendant
NIALL SILVA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| UNITED STATES OF AMERICA, | ) | CR. NO. 16-00787-JMS |
|---|---|---|
| Plaintiff, | ) ) ) | **NIALL SILVA'S SENTENCING MEMORANDUM AND MITIGATING FACTORS WHICH THE COURT SHOULD CONSIDER; CERTIFICATE OF SERVICE** |
| vs. | ) ) ) | |
| NIALL SILVA, | ) ) | |
| Defendant. | ) ) | |

## NIALL SILVA'S SENTENCING MEMORANDUM AND MITIGATING FACTORS WHICH THE COURT SHOULD CONSIDER

Comes now Defendant NIALL SILVA, by and through his counsel, William A. Harrison, and hereby submits his sentencing memorandum pursuant to 18 USC§ 3553, which suggests additional mitigating factors

which the court should consider in this matter.

I. **INTRODUCTION**

On June 22, 2013, Niall received a call from his superior who asked that he come to work to receive and process some evidence. He distinctly remembers that it was his normal day off. He was wondering why it was so important that he be called in on a Saturday. When he got to work Bobby Nguyen and Derrick Hahn were there and recounted the facts of the mailbox crime "committed" against the Chief. Niall was aware of the talk of prior incidents concerning Gerard Puana and his "run ins" with Chief Kealoha.

Niall was told by superior Derek Hahn to process the hard drive by downloading the digital video onto a disk. As they were viewing the digital video and observed what appeared to be a male removing the Chief's mailbox, Nguyen blurted out "that's Uncle Jerry." Niall did not know what Gerard Puana looked like so took it on face value that the culprit on the video recording was indeed Mr. Puana.

Niall completed the processing and was about to turn over the items, when he was told to "hold onto it" and not submit it to the case Detective "just yet." Niall was also told that although Bobby Nguyen had retrieved the hard drive from the Chief's house, it would not look good if that notation

2

were made since Bobby was related to the Chief. It would look better if a neutral third party had retrieved the equipment. Niall was then asked to put in the evidence report that it was he, not Nguyen that did so. At first blush Niall did not question the request, as Nguyen retrieved the Chief's recordings from the house for review by CIU on a weekly basis. Niall trusted that Nguyen had done so once again and that he could count on the recovery being proper. Niall could not have imagined that this "white lie" would wind up not only destroying his good character and credibility but more importantly the Puana family. Had he known the full extent of the conspiracy he clearly would not have gone down that road. How do we know this? Every single reference letter submitted on his behalf supports the notion that what Niall did was completely out of character.

After the creation of the false report, Niall compounded the damage by continuing the false allegations through court proceedings and interviews. However, to his credit, when he finally realized the extent of the police misconduct in the Puana case, he suffered from extreme remorse, thus gave a full statement of his complicity, and immediately agreed to cooperate.

II. **SALIENT POST OFFENSE FACTS**

Niall has been in the public eye since admitting his wrongful

conduct. He has had to endure not only the embarrassment and humiliation of his involvement in this case, but the even more painful fact that his actions not only has saddened and disheartened his family and friends but injured an innocent person.

His agreement to cooperate has also made him a pariah to many of his former co-workers, as he chose to violate the "Blue Code of Silence."

Niall's offer to assist the government in the prosecution of other confederates has led the United States to note in its Motion for Downward Departure and Sentencing Memorandum, that Niall's "cooperation greatly assisted the United States in uncovering the crimes committed by the Kealohas, Hahn, and Nguyen." Accordingly, he has done everything possible to ameliorate the effects of his wrongful conduct and involvement in this case.

Moreover, since his plea Niall has been on pretrial release for four years and complied with all conditions of release.

### III. ADDITIONAL FACTORS TO BE CONSIDERED

#### A. Nature and Circumstance of the Offense.

18 USC § 3553 (a) (1) states that in determining the particular sentence to be imposed, the court should consider the nature and circumstances of the

offense. The unique circumstances which the court should consider include, the nature of his involvement, the extraordinary ameliorative and rehabilitative efforts undertaken since committing the offense and the unmistakable aberrancy of his wrongful actions.

### B.     Family, Community Involvement and Support

Niall has shown extraordinary community involvement before and since, acknowledging his illegal conduct.

He is intimately involved with New Hope Oahu Church, assisting with the children's ministry, security and just about anything needs church has. This community service has been over the course of decades and has escalated since 2016. He has mentored kids, other employees, and Christians, as well as raised "hanai" children in addition to his own.

Moreover, his community mindedness has garnered him substantial community and family support from all walks of life. Indeed, the character reference letters provide substantiation that Niall has given much of himself, which in turn has cultivated the considerable support of family and friends, who will undoubtedly be there as his "safety net," in times of need.

This considerable community support is reflected in the eighty-two (82) character reference letters submitted to the court on his behalf. Letters

that are not superficial offerings, but detailed epistles highlighting the man he truly is. It would take many more pages to insert here verbatim excerpts of the many accolades given Niall by those close to him. Instead, a brief list of the superlatives written about the content of his character will clearly document the fact that his conduct in this case is an aberration. The letters note Niall as an individual who is: God fearing, dedicated, hard-working, patient, courageous, generous, supportive, helpful, genuine, compassionate, committed, dependable, caring, considerate, humble, moral, loving, meticulous, organized, devout family man and the list goes on! These traits are an accurate indication of the real man who will be standing before this court at sentencing.

**C. Given the Nature and Circumstances, History and Characteristics, a Departure/ Variance Would be Sufficient, But Not Greater Than Necessary, to Satisfy the Purposes of Sentencing.**

In enacting the Sentencing Reform Act, Congress did "not favor one purpose of sentencing over another." *See* S. Rep. No. 98-225, at 67 (1983). Rather, "each of the four stated purposes should be considered in imposing sentence in a particular case," and "one purpose of sentencing may have more bearing on the imposition of sentence in a particular case than another

purpose has." *Id*. at 68. In choosing what kind of sentence to impose, the court "must consider" all the purposes and factors set forth in § 3553(a). *Id*. at 119. "Whether [imprisonment] should be imposed when authorized is a question to be resolved after balancing all the relevant considerations." *Id*.

Here, all the purposes of sentencing point in the same direction. Incarceration is not necessary to protect the public, and would be a particularly unnecessary punishment for Niall, who recognized his illegal behavior, came forward, admitted his conduct, and took appropriate steps to make amends to his community.

**1. Need for Just Punishment in Light of the Seriousness of the Offense, 18 U.S.C. § 3553(a) (2) (A)**

*(a) Seriousness of the offense*

One cannot muster much of a challenge to the argument that a law enforcement officer should be held to a higher standard than most. That being said, Niall clearly understands the nature and severity of the wrong that he has committed. The presentence report notes that he "expressed remorse for committing the instant offense" and "that the ends do not justify the means." See PSI at p.29 -30.

His letter to the court also attests to his contrition. "I realize that my

wrongful actions caused Mr. Puana to suffer and for that I am truly and forever sorry."

Additionally, many of the letters provided the court also confirms Niall's recognition of his unlawful conduct and his heartfelt remorse.

In short, Niall has taken full responsibility for his actions, accepts that he will be punished, and has fully cooperated with authorities, evincing his respect for the lawful authority of the government. His crime is indicative of a complete lapse in judgment.

It is also clear that the circumstances which generated the charges in this case, that is a blind and wrongful adherence to others, will never happen again.

### (b) *Just punishment*

Since the inception of the guidelines, the Commission has acknowledged that home confinement is a justifiable "substitute for imprisonment." USSG § 5F1.2.

Niall's crime is undoubtedly a serious offense, and he has already incurred significant collateral consequences as a result. He and his family has suffered substantial public ridicule and humiliation. He has been under court supervision for 4 years. He has lost the ability to own a firearm. He

will forever be linked to the most notorious public corruption case in the annuls of Hawaii's history. Any additional form of retribution and punishment becomes an incremental penalty for Niall's actions in this case.

### 2. Need for Adequate Deterrence, 18 U.S.C. § 3553(a) (2) (B)

The empirical evidence is unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 2829 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence between

probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

The Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level. . .. While surprising at first glance, this finding should be expected.  The guidelines' offense level is not intended or designed to predict recidivism."  U.S. Sent'g Comm'n, *Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004) ["U.S. Sent'g Comm'n, *Measuring Recidivism*"].  *See also* Part IV.A.3, *infra*.  And according to "the best available evidence . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al.*, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

### 3. Need for Incapacitation, 18 U.S.C. § 3553(a) (2) (C)

Current empirical research demonstrates that Niall is highly unlikely to repeat or engage in criminality. Indeed, Niall's history and characteristics make him an exceptionally low risk to re-offend. According to the Commission, recidivism rates in general (defined to include technical supervised release violations) "decline relatively consistently as age increases," from 35.5% for offenders under age 21, down to 12.7% for offenders age 41 to 50, and **down to 9.5% for offenders over age 50.** U.S. Sent'g Comm'n, *Measuring Recidivism* at 12 & Exh.9. "The only factors found relevant to sentencing decisions that also affected the likelihood of recidivism were age and marriage. The finding that age reduced the likelihood of committing subsequent offenses is consistent with the body of research that finds that offenders 'age out' of crime. The finding that marriage has a significant effect on recidivism also is consistent with other research which has found that marriage is associated with lower crime rates." Tina L. Freiburger & Brian M. Iannacchione, *An Examination of the Effect of Imprisonment on Recidivism*, 24 Crim. Just. Stud. 369, 377 (2011).

Moreover, the cost of incarcerating prisoners age 50 and older has been

estimated to be two to four times that of the general inmate population.[1] "In addition to the economic costs of keeping older prisoners incarcerated, it is important to consider whether the infringement upon the liberty interest of an older prisoner who is no longer dangerous is justified."[2]

The Commission's research also demonstrates that employment, education, and family ties and responsibilities all predict reduced recidivism, *see* U.S. Sent'g Comm'n, *Measuring Recidivism* at 12-13 & Ex. 10.

In short, Niall's age, strong family and community support, education, vocational training, and gainful employment, strongly support the conclusion that it is unlikely that Niall will ever be entangled with the criminal justice system again. Therefore, probation and/or home confinement with appropriate conditions is more than sufficient in this case.

---

[1] U.S. Dept. of Justice, National Institute of Corrections, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, at 11 (2004) (*Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*), *available at* http://www.nicic.org/pubs/2004/018735.pdf; Oklahoma Department of Corrections, *Managing Increasing Aging Inmate Populations* (Oct. 2008), available *at* http://www.doc.state.ok.us/adminservices/ea/Aging%20White%20Paper.pdf.

[2] William E. Adams, *The Incarceration of Older Criminals: Balancing Safety, Cost, and Humanitarian Concerns*, 19 Nova L. Rev. 465, 466 (1995).

4.  **Need for Medical Care and Correctional Treatment in the Most Effective Manner, 18 U.S.C. § 3553(a) (2) (D)**

Niall suffers from type 2 diabetes, high cholesterol, high blood pressure, and asthma. These conditions have a demonstrated correlation to increased case severity and fatality for COVID-19 patients.[3]

The most effective manner of treatment for these conditions therefore would be to allow him to continue with his present medical care outside of a prison.

III. **The Sentence Requested Meets the Purposes of Sentencing Under the Circumstances in this Case and Is Consistent with Recent Case Law.**

This Court is required to consider "the kinds of sentences available" by statute. 18 U.S.C. § 3553(a) (3). Congress has provided for a range of sentences in this case. Accordingly, a sentence of probation and/or home detention, community service and a fine, is an appropriate sentence in this case.

---

[3] Nsikan Akpan, *These underlying conditions make coronavirus more severe, and they're surprisingly common*, National Geographic (March 10, 2020), https://www.nationalgeographic.com/science/2020/03/these-underlying-conditions-make-coronavirus-more-severe-and-they-are-surprisingly-common/.

## IV. CONCLUSION

For the reasons stated, NIALL SILVA respectfully requests that this Court grant the government and Defendant's joint request for a departure/variance and impose a sentence of probation, community service, a fine of no more than $5,000.00 and if the court deems appropriate, a condition of home detention.

DATED: at Honolulu, Hawaii, January 12, 2021.

/s/ William A. Harrison
WILLIAM A. HARRISON
Attorney for Defendant
NIALL SILVA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 15-00830-LEK-01 |
| | ) | |
| Plaintiff, | ) | **CERTIFICATE OF SERVICE** |
| vs. | ) | |
| | ) | |
| NIALL SILVA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing will be duly served after filing, by hand delivery, email (ECF) or by mail, postage prepaid, on the following parties at their last known addresses:

**MICHAEL J. WHEAT, ESQ.**
Special Attorney to the Attorney General
United States Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101

**DARSIE J.T. ING-DODSON**
Senior U.S. Probation Officer
United States Probation Office
300 Ala Moana Boulevard
Honolulu, Hawaii 96850

DATED: at Honolulu, Hawaii, January 12, 2021.

/s/ William A. Harrison
WILLIAM A. HARRISON